# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **17th day of November, 2023** are as follows:

**PER CURIAM:**

2023-B-00343     IN RE: TIM L. FIELDS

SUSPENSION IMPOSED. SEE PER CURIAM.

Weimer, C.J., concurs in part, dissents in part and assigns reasons. Crichton, J., concurs in part, dissents in part and assigns reasons.

ATTORNEY DISCIPLINARY PROCEEDING

PER CURIAM

This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Tim L. Fields, an attorney licensed to practice law in Louisiana.

**UNDERLYING FACTS**

*Count I*

Dr. George Van Wormer is a chiropractor who has had a longstanding arrangement with respondent to provide his personal injury clients with medical care and receive payment for those services upon settlement of the clients' claims. From February 2016 to August 2016, Dr. Van Wormer treated three of respondent's clients, namely Edwin Brooks, Mathieu Fletcher, and Mateo Fletcher. Respondent settled the claims of all three clients in early 2017. Nevertheless, and despite Dr. Van Wormer's staff contacting respondent's office numerous times in an effort to collect the three clients' debts, respondent failed to pay Dr. Van Wormer's bills, which totaled $6,916.

On December 13, 2018, the ODC received a disciplinary complaint from Dr. Van Wormer. The ODC sent notice of the complaint to respondent, which he received on January 1, 2019. On January 3, 2019, respondent issued a $6,916 check from his trust account to Dr. Van Wormer. This check was signed by respondent's CPA, who is not an attorney.

Upon further investigation, the ODC received copies of the three trust account checks respondent issued to the clients who were the subject of Dr. Van Wormer's complaint. Two of the checks were dated February 21, 2017 and one check was dated April 21, 2017. The checks were signed by respondent's former paralegal instead of an attorney.

On June 19, 2019, respondent appeared with his counsel at the ODC's office to provide a sworn statement. During the sworn statement, respondent testified that his CPA and his former paralegal both had authority to sign his trust account checks. Respondent also testified that his former secretary Mary Samuels left the firm, and he was not aware Dr. Van Wormer was not paid because the matter was never brought to his attention. Respondent further testified that he never had a problem with this type of issue before the current situation occurred.

Also during the sworn statement, respondent testified that his law practice has consisted of "almost exclusively personal injury" cases since 1999. However, respondent later acknowledged that he did not maintain a trust account between approximately 2006 and 2011. Furthermore, on the trust account disclosure statements he filed with the disciplinary board from November 10, 2006 to November 14, 2012, respondent falsely certified that he did not handle client or third-party funds.

On August 14, 2019, respondent again appeared with his counsel at the ODC's office, at which time he participated in a recorded interview with Deputy Disciplinary Counsel Robin Mitchell as well as the ODC's forensic auditor, Angelina Marcellino. During this interview, respondent acknowledged that he "wasn't exactly candid" during his sworn statement. He then indicated that, in approximately March 2015, he discovered Ms. Samuels had failed to pay his clients' medical providers and other third parties (approximately 50 third parties associated with at least 300 clients) a combined total of approximately $4.2 million between

2

2009 and 2015. He explained that Ms. Samuels had been indiscriminately transferring client settlement funds from his trust account to his operating account. Those client funds in his operating account were then used to pay his personal and office expenses. Respondent further explained that he contacted the third parties to whom he owed the majority of the client settlement funds, namely Louisiana Primary Care, Health Care Center, Metropolitan Health Group, and Magnolia Diagnostics, and those third parties agreed to continue working with him and his current and future clients. However, they required respondent to pay the oldest client accounts first. Therefore, between 2015 and August 2019, his pattern and practice was to use third-party funds from settlements obtained for his current clients to pay the older third-party invoices generated by his previous clients between 2009 and 2015.[1] Finally, respondent advised the ODC during the interview that he had recently ceased this pattern and practice.

The ODC then obtained bank statements and trust account records from respondent for the period between January 1, 2017 and January 31, 2019. Respondent's CPA also provided the ODC with documentation he had compiled relevant to respondent's trust account and money owed to third parties. Upon reviewing this information, Ms. Marcellino confirmed that respondent had converted $4,148,944.59 as of July 10, 2015 and had engaged in "rolling conversion" between 2015 and August 2019 just as he had admitted to during the August 14, 2019 recorded interview. According to Ms. Marcellino and the records provided by respondent, by September 30, 2019, respondent's trust account was still short

---

[1] Evidence in the record indicates that, in addition to using current client settlement funds to pay the old outstanding third-party debt, respondent also obtained business and personal loans in August 2015, borrowed from his individual retirement account in July 2015, sold two pieces of real property in 2019, cashed in an annuity in 2019, and withdrew from his investment accounts in 2019 and 2020.

$1,840,366.54 needed to repay the original third-party debt. By June 14, 2020, respondent had reduced the shortage to $814,268.69.

The ODC also obtained a copy of respondent's standard contingency fee contract used for all personal injury clients. The contract stated, "A standard file charge of One hundred twenty-five dollars ($125.00) shall be assessed at the time of distribution of any funds received in judgment or settlement." This $125 fee appeared on various disbursement statements provided by respondent and was not attributable to any costs or services undertaken for those specific clients. Respondent has since deleted this fee from the contract and no longer lists the charge on disbursement statements.

*Count II*

In August 2018, Sam Montgomery hired respondent to handle his personal injury claim. Mr. Montgomery signed respondent's standard contingency fee contract, which conveyed "complete settlement authority" to respondent. Mr. Montgomery also signed a power of attorney in favor of his relative, Calvin Stewart.

In April 2019, respondent settled Mr. Montgomery's claim for the $15,000 insurance policy limits because it was his normal practice to accept the policy limits as full and final settlement. When respondent received the settlement check in May 2019, someone from his office endorsed Mr. Montgomery's signature on the back of the check. The check was then deposited into respondent's trust account.

Mr. Stewart stopped by respondent's office in June or July 2019 and was told Mr. Montgomery's case had settled. In August 2019, Mr. Stewart and Mr. Montgomery went to respondent's office to view the insurance policy limits and a copy of the settlement check. Mr. Montgomery then signed the release and the disbursement statement and accepted $4,529.52 as his portion of the settlement proceeds.

4

On August 29, 2019, the ODC received a disciplinary complaint from Mr. Montgomery, alleging that respondent settled his claim without his knowledge or consent. In response to the complaint, respondent admitted that he settled Mr. Montgomery's claim without his permission but asserted he had the authority to do so pursuant to the contingency fee contract. Respondent has since removed such authority from his standard contingency fee contract. He also admitted that he had someone in his office sign Mr. Montgomery's name on the back of the settlement check but asserted Mr. Montgomery had given him verbal authority to do so.

## DISCIPLINARY PROCEEDINGS

In June 2020, the ODC filed formal charges against respondent. In Count I, the ODC alleged that respondent violated the following provisions of the Rules of Professional Conduct: Rules 1.1(c) (failure to submit accurate trust account information), 1.8(e)(3) (overhead costs of a lawyer's practice, which are those not incurred by the lawyer solely for the purposes of a particular representation, shall not be passed on to a client), 1.15(a) (safekeeping property of clients or third persons), 1.15(d) (failure to timely remit funds to a client or third person), 1.15(f) (every check, draft, electronic transfer, or other withdrawal instrument or authorization from a client trust account shall be personally signed by a lawyer), 1.15(g) (a lawyer shall create and maintain a trust account for funds belonging to clients and third persons), 5.3 (failure to properly supervise a non-lawyer assistant), 8.1(b) (knowing failure to respond to a lawful demand for information from a disciplinary authority), 8.1(c) (failure to cooperate with the ODC in its investigation), 8.4(a) (violation of the Rules of Professional Conduct), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). In Count II, the ODC alleged respondent violated Rules 1.2 (scope of the representation) and 1.8(k) (a lawyer shall not solicit or obtain a power of attorney or

5

mandate from a client which would authorize the attorney, without first obtaining the client's informed consent to settle, to enter into a binding settlement agreement on the client's behalf or to execute on behalf of the client any settlement or release documents) of the Rules of Professional Conduct.

Respondent, through counsel, filed an answer to the formal charges on July 27, 2020. In his answer, he denied engaging in any misconduct. However, if he were to be found to have engaged in misconduct, he claimed that he did so negligently and asserted the affirmative defense of prescription, pursuant to Supreme Court Rule XIX, § 31, against allegations of misconduct occurring more than ten years ago.[2] He also indicated he still owed $735,079.39 to third-party providers but asserted he would have this amount paid in full within approximately six months.

In light of respondent's answer, the matter proceeded to a formal hearing on the merits.

*Formal Hearing*

The hearing committee conducted the formal hearing on April 15, 2021. Both respondent and the ODC introduced documentary evidence and called witnesses to testify before the committee. Respondent also testified on his own behalf and on cross-examination by the ODC.

Additionally, the parties filed joint stipulations wherein they stipulated that, if certain witnesses were called to testify, their testimony would be consistent with the underlying facts set forth above. These witnesses were Dr. George Van Wormer, Dr. Van Wormer's office manager Jennifer Joubert, Edwin Brooks, Mathieu and Mateo Fletcher's father Mervin Fletcher, Sam Montgomery, and Calvin Stewart.

---

[2] Supreme Court Rule XIX, § 31 provides that "[a] disciplinary complaint, or the initiation of a disciplinary investigation with regard to allegations of attorney misconduct, where the mental element is merely negligence, shall be subject to a prescriptive period of ten years from the date of the alleged offense."

PETER HENRY'S TESTIMONY

Mr. Henry, the director of risk management and counsel for Oasis Financial ("Oasis"), testified that Oasis provides loans to individuals engaged in personal injury litigation by purchasing a portion of the client's future settlement proceeds from pending lawsuits. Oasis requires clients to sign a contract and also requires the client and the client's attorney to sign a letter directing the attorney to pay Oasis out of proceeds from the client's lawsuit. The amount a client owes Oasis will increase in a "stair step function" over time, and respondent's office would need to contact Oasis for a final payoff amount when the client's case settles.

As of March 31, 2021, Oasis had 55 accounts open with respondent's clients. Oasis was advised by respondent's CPA that 18 of those clients' cases had settled without Oasis having been paid. Oasis occasionally submits accounts to collections, and all attempts to collect are from the client. Mr. Henry testified that the accounts of two of respondent's clients, Elijah Sorina and Jovita Davis, were sent to collections.

JAMES KEEL'S TESTIMONY

Mr. Keel, a part-owner of Magnolia Diagnostics ("Magnolia"), testified that all patients, including respondent's clients, sign a form guaranteeing they are responsible for payment. However, Magnolia never pursued any of respondent's clients personally for payment even though respondent had a habit of falling behind in paying his clients' bills. Mr. Keel stated that this tendency to fall behind occurred most often while Mary Samuels worked for respondent.

Whenever Mr. Keel would "chase down" respondent about the status of cases, respondent would give him the truth even if the case was already settled. One day, respondent bragged to Mr. Keel about purchasing an expensive bottle of wine. At

the time, respondent owed Magnolia approximately $100,000, which included bills on some cases that had already settled.

Mr. Keel initiated a call to respondent in an effort to collect the outstanding debt owed to Magnolia and prod respondent into making payments. Because Mr. Keel was concerned about prescription on cases that had settled more than three years earlier, he made an agreement with respondent wherein respondent would make large payments on the older cases first. Magnolia initially received large payments in bulk, such as $70,000 or $40,000. Later, however, respondent started sending one or two checks a month that paid off accounts in groups. For example, Magnolia received a check dated October 13, 2020 in the amount of $12,350 for payment on ten different client accounts with dates of service from 2018.

RON MCDONALD'S TESTIMONY

Mr. McDonald, the marketing director for the Health Care Center, testified that his company provides services to respondent's clients with an unwritten agreement to accept payment from client settlements at the conclusion of their cases. The Health Care Center relies on attorneys to pay bills upon settlement of the cases, and he has no way of knowing if bills are paid timely unless a lawsuit has been filed.

In 2015, the Health Care Center discovered outstanding accounts for respondent's clients totaling between $430,000 and $440,000. At that time, Mr. McDonald initiated a meeting with respondent, during which respondent acknowledged a large outstanding debt on his clients' cases that had settled. Respondent agreed to pay the Health Care Center $5,000 per week until he paid the outstanding amount due, which he ultimately did. Furthermore, Mr. McDonald understood that "as new cases were being settled, [respondent] was going to take that money to pay off old antecedent debts." Mr. McDonald indicated that the Health

Care Center never pursued respondent's clients personally for payment even if their cases had settled long ago.

KEVIN HARVEY'S TESTIMONY

Mr. Harvey, who handles collection services for Metropolitan Health Group ("Metropolitan"), testified that his staff would send respondent a narrative and final medical packet with complete bills and records at the conclusion of each client's treatment. His staff would also send aging reports to respondent several times a year. Mr. Harvey explained that his staff is trained to question patients about the status of their lawsuits, and it raises a red flag when patients indicate their case was settled. At some point, Mr. Harvey ran an aging report for all of respondent's clients and told respondent the aging report showed a debt of approximately $3 million.

After respondent met with his CPA about the matter, Mr. Harvey agreed to allow respondent to pay him on older cases and stay current with the other cases as they settled. Thereafter, Mr. Harvey and respondent entered into an agreement whereby respondent would pay $10,000 a week on the various accounts with balances. Respondent abided by the agreement, sometimes paying more than $10,000. The current debt owed by respondent's clients to Metropolitan is approximately $800,000, which amount includes clients currently treating. Mr. Harvey acknowledged that it was in Metropolitan's best interest to wait for respondent to pay as opposed to try to collect from each client.

ANGELINA MARCELLINO'S TESTIMONY

Ms. Marcellino testified that, at the conclusion of her audit of respondent's trust account, she determined he had mismanaged the account and allowed a non-lawyer to authorize disbursements from the account. She also determined that he had converted client and third-party funds, having defined conversion as "[a]t any

point in time, the trust account does not hold a sufficient balance to honor the sum of any and all client and third-party money received by the attorney and not yet paid to the respective parties due." She further indicated that respondent did not have to benefit from the conduct for it to be considered conversion. In explaining rolling conversion, Ms. Marcellino stated that it "starts with the trust account being insufficient to honor a client or third party's obligation, and then over time, that first converted balance is resolved; however, it results in separate and unrelated matter balances being converted." In other words, a rolling conversion is "robbing Peter to pay Paul."

Based upon her audit, Ms. Marcellino determined that, between 2009 and July 2015, respondent converted approximately $4.2 million owed to third-party providers on behalf of clients. Between July 2015 and 2019, funds owed to third-party providers from current settlements were instead used to pay the balances owed to third-party providers affected by the previous $4.2 million conversion. Third-party provider funds converted from settlements that occurred between 2015 and 2019 totaled approximately $1.8 million. In August 2019, respondent stopped this rolling conversion and began, instead, to only use his personal assets or earned attorney's fees to repay the money owed that had previously been converted. Based upon this information, Ms. Marcellino concluded that, between 2009 and 2019, respondent converted a total of approximately $6 million. However, by the time of the formal hearing, respondent had reduced the amount owed in previously-converted funds to approximately $200,000.

MARY SAMUELS' TESTIMONY

Ms. Samuels testified that she worked as respondent's secretary from 2009 to November 2015. One of her responsibilities was to pay third-party providers. Other staff members assisted in making these payments, but she handled the majority. Ms. Samuels stated that respondent never provided any training, and she had to learn on the job. She had no law office or accounting experience before respondent hired her, and respondent had 300 to 400 files open at any given time. She described the office as very chaotic.

Before writing the checks to third-party providers, Ms. Samuels would have to call them to verify the amount due. However, respondent's office was so chaotic that the task would be put to the side, and the number of files needing verification from third-party providers would stack up. She also sometimes had problems getting responses and/or written confirmations of bill reductions from the third-party providers, which also contributed to the lag in payments. Whenever a third-party provider called about not being paid promptly, respondent would tell Ms. Samuels to just pay them without trying to figure out why they had not been paid in a timely manner.

Ms. Samuels denied that respondent told her not to pay the third-party providers. She also never saw him take money that he was not entitled to. Therefore, it is her belief that respondent never knowingly or intentionally failed to pay third-party providers. Furthermore, she did not think respondent knew money that should have been paid to third-party providers was, instead, transferred to his operating account. However, she denied indiscriminately transferring money. Instead, she transferred money when told to do so. Respondent also informed her every time an overdraft occurred, which happened a lot. There were many times when the operating account did not have enough money to pay bills, and respondent would

give her permission to transfer money into it from his personal account or the trust account.

When asked if she was responsible for the $4.2 million in unpaid third-party provider debt, Ms. Samuels stated that she probably could have managed her job a little better. She also indicated that, once respondent learned of the $4.2 million conversion, he shifted the responsibility of settlement disbursements to his CPA.

RESPONDENT'S TESTIMONY

Respondent testified that his office collects approximately $5 to $7 million in settlements per year. Over the past decade, respondent estimated that he has collected a total of $60 to $70 million in settlements for his clients.

Respondent disagreed that the initial conversion amount was as high as $4.2 million because the total included some cases that had not yet settled. However, he admitted to using current client settlement funds between July 2015 and August 2019 to pay older debts owed to third-party providers affected by the initial conversion, which he claimed was what the third-party providers wanted him to do. In August 2019, he ceased this practice and, instead, paid the old outstanding third-party debt by (1) borrowing against his 401(k), (2) trying to refinance his home loan, (3) cashing out an annuity and an investment account, (4) selling two pieces of real property, and (5) using his own attorney's fees. Prior to 2019, he had liquidated other personal assets to help pay the debt but had never used his attorney's fees. Respondent also acknowledged that the total conversion amount was approximately $6 million. However, he pointed out that the total amount of conversion at any one time was never more than the initial $4.2 million.

Regarding his failure to maintain a trust account for several years, respondent claimed that a woman from the Louisiana State Bar Association ("LSBA") called him in 2006 and informed him he only needed a trust account if he kept succession

12

or real estate funds in escrow. He told her that he only handled personal injury matters, and she advised him that, in that case, he did not need a trust account. Based upon this advice, he closed his trust account in 2006. He could not recall the woman's name and made no effort to contact the LSBA to determine who had called him. During this time period, respondent deposited client settlement funds into his operating account. He admitted the operating account had numerous overdrafts during this time period, but he thought the overdrafts were "typical" because they were writing 500 checks a month out of the account. Respondent further claimed that, when he switched to a different bank in 2011, he opened a new trust account. However, he had no documentation showing he opened the new account in 2011 and admitted that he did not update his trust account disclosure statement with the new trust account information until November 2012. Respondent further admitted that, between 2006 and 2012, he misrepresented on his trust account disclosure statements that he did not handle client or third-party funds.

Once he opened the new trust account, all client settlement funds were deposited into and disbursed from the trust account. Ms. Samuels was responsible for transferring his earned attorney's fees from the trust account to the operating account. Until July 2015, respondent did not know Ms. Samuels was making bulk transfers from the trust account into the operating account, and no issues or problems with the trust account were brought to his attention. Respondent admitted he did not direct or oversee each individual transfer Ms. Samuels made from the trust account. He also acknowledged that she was overwhelmed and that he failed to supervise her. Before hiring Ms. Samuels in 2009, respondent indicated he handled all disbursements himself. He stated, "I just assume everybody knows everything that's going on and they can catch on. And it's not that hard to do a disbursement… but she was just overwhelmed."

Respondent claimed he first learned of the $4.2 million outstanding balance owed to third-party providers in July 2015 from his CPA. Unbeknownst to respondent at the time, Ms. Samuels had met with Mr. Harvey of Metropolitan, who informed her that respondent owed Metropolitan $3 million from client settlements. After that meeting, Ms. Samuels informed respondent's CPA of the issue, and the CPA informed respondent. Soon thereafter, respondent's CPA took over the handling of the trust account.

Once his CPA took over, respondent began to use new client settlement funds to pay the old outstanding third-party debt at the direction of the third-party providers. In paying the old third-party debt, respondent's CPA would include a list of several clients' bills to which the bulk check should be applied. Although respondent took a more active role in the third-party disbursements beginning in 2015, he still allowed non-lawyers to sign trust account checks until after he met with the ODC in 2019.

Respondent maintained that his staff never informed him of Dr. Van Wormer's numerous requests for payment. Respondent claimed his staff knew about Dr. Van Wormer's requests but kept the bills in accounts payable instead of paying them right away. According to respondent, all third-party providers were put on the accounts payable list because of the large amount of outstanding debt, and which ones got paid first sometimes depended upon which ones were demanding payment at the time. When respondent finally became aware of Dr. Van Wormer's attempts to contact him, he called and left a message for Dr. Van Wormer and never received a call back. Instead, he received notice of Dr. Van Wormer's disciplinary complaint.

Regarding the $125 general office expense set forth in the contingency fee contract, respondent stated that he did not know how the fee slipped into his contract. He also acknowledged that charging this type of fee violates the Rules of

14

Professional Conduct. He claimed the fee is no longer a part of the contract and is no longer charged to clients.

Respondent also admitted to making false and misleading statements to the ODC during his sworn statement. For example, he blamed Ms. Samuels for not informing him of the issue with Dr. Van Wormer even though she was no longer working for him when the issue initially arose. He also failed to inform the ODC of the extent of the outstanding third-party debt, instead stating that this type of thing had never occurred before. When he provided the recorded interview to the ODC in August 2019, he provided accurate information.

Regarding the Montgomery matter in Count II, respondent acknowledged that he did not obtain Mr. Montgomery's permission to settle his claim. However, the contingency fee contract Mr. Montgomery signed gave respondent the authority to settle the claim. Respondent indicated he settled the claim for the policy limits, but he did not inform Mr. Montgomery that he could pursue the driver personally for further compensation. Currently, the contingency fee contract respondent uses does not include the clause giving him the authority to settle a client's claim without their knowledge or consent because such a clause violates the Rules of Professional Conduct.

In mitigation, respondent testified that he is involved in numerous charities by donating funds and/or sitting on the board. He also liquidated his personal assets to help pay the outstanding third-party debt long before the ODC started investigating him. By the time of the formal hearing, the outstanding debt had been reduced to approximately $229,550.59.

*Hearing Committee Report*

After considering the evidence and testimony presented at the hearing, the hearing committee made the following findings:

Count I: Respondent acknowledged his failure to maintain a trust account from some time in 2006 until January 10, 2011. However, respondent asserted his misconduct was negligent because he was following the instructions of someone from the LSBA who had advised him he did not need a trust account if he did not hold client funds in escrow. The committee determined respondent's testimony was not credible since he acknowledged making no effort to find out the person's name. The committee also noted that respondent's decision to close his trust account in 2006 coincided with the November 1, 2006 effective date of the overdraft notification procedure set forth in Supreme Court Rule XIX, § 28.[3] Similarly, the committee found unconvincing respondent's testimony that he misunderstood the trust account disclosure statement because, when he signed the trust account disclosure statement each year, he knew he was handling client and third-party funds and would continue to do so in the future. Based upon these findings, the committee determined respondent knowingly violated Rules 1.1(c) and 1.15(g) of the Rules of Professional Conduct.

Between 2009 and July 2015, approximately $4.2 million in settlement funds were withheld from respondent's clients to pay their third-party provider debts. However, the funds were instead used to pay respondent's personal and operating

_____

[3] Rule XIX, § 28(D) provides:

> A financial institution shall be approved as a depository for lawyer trust accounts if it files with the Board an agreement, in a form provided by the Board and approved by the Court, to report to the Office of Disciplinary Counsel whenever any properly payable instrument is presented against a lawyer trust account containing insufficient funds, irrespective of whether or not the instrument is honored. The Board shall administer securing participation of the financial institutions, and shall annually publish a list of the financial institutions that have executed overdraft notification agreements with the Board. No trust account shall be maintained in any financial institution that does not agree to so report. Any such agreement shall apply to all branches of the financial institution and shall not be cancelled except upon thirty (30) days notice in writing to the Board. Notification of trust or escrow account overdrafts shall be made in accordance with La. R.S. 6:332 and La. R.S. 6:333(F)(16).

expenses. Respondent acknowledged that, in July 2015, he did not have $4.2 million in his various bank accounts to pay these third-party debts. Based upon this information, the committee determined respondent converted client funds. Respondent claimed the conversion was the result of his failure to supervise his non-lawyer staff, namely Mary Samuels. Respondent authorized Ms. Samuels to sign his name on checks and process online account transfers but did so despite the fact that she had no law office or bookkeeping experience. During part of the time Ms. Samuels worked for respondent, he used his operating account to hold client and third-party funds, and said account was overdrawn on numerous occasions. Respondent failed to take steps to determine the cause of the overdrafts. When respondent eventually reopened a trust account, he continued to allow Ms. Samuels to handle disbursements to third-party providers. He also continued to allow her online access to the trust account so she could transfer funds from the account to his operating and personal accounts. Respondent admitted he did not oversee or direct each individual transfer Ms. Samuels handled. Respondent also admitted that he authorized his CPA and former paralegal to sign trust account checks. However, he claimed to have ceased this practice in 2019. Based upon these findings, the committee determined respondent violated Rules 1.15(a) and 1.15(f). The committee also determined that respondent initially acted negligently, but then his actions became knowing and, in some instances, intentional.

The committee considered the testimony of the representatives from several third-party providers affected by the $4.2 million conversion. The committee viewed the testimony against the backdrop that these third-party providers had a vested interest in respondent's continued practice of law so (1) he would be able to continue to pay the outstanding bills and (2) he would continue to send them new clients. Respondent acknowledged that, in addition to the approximately $4.2 million withheld from client settlements between 2009 and July 2015, he also

17

withheld approximately $1.8 million from other client settlements between July 2015 through August 2019. He used the $1.8 million to pay a portion of the $4.2 million previously-unpaid client debt and acknowledged that the cumulative amount of client settlement funds converted was approximately $6 million even though the amount was never higher than $4.2 million at any one time because of the nature of the rolling conversion. The committee further determined that the clients' signing of the settlement disbursement statements was a directive under Rule 1.15(d) to respondent as to how much and to whom each client's settlement funds were to be distributed. Documents prepared by respondent's CPA demonstrate that numerous clients and third-party providers were harmed because their settlement funds and recovered costs were converted. Specifically, reports dated September 30, 2019 indicate approximately 75 third-party providers were owed money stemming from client settlements that occurred between July 2015 and August 2019 but were not paid upon disbursement of the clients' settlement funds. While respondent had permission from the four largest third-party providers to shift funds owed from current client settlements to aging client debt, there was no evidence presented that he had permission from any of the remaining 71 third-party providers or from a single client to do so. With respect to respondent's mental state, the committee determined the initial $4.2 million conversion resulted from respondent's negligence. However, with respect to the conversion of the $1.8 million, respondent's actions were intentional since he consciously directed that money from current client settlements be used to pay unrelated bills associated with prior client settlements in order to cover the earlier conversion of funds. The committee also noted that not a single debt owed to Medicare or Medicaid, which both have statutory rights of recovery, was left unpaid. The committee determined respondent and his staff knew about the statutory rights because they paid these debts in a timely manner while choosing not to pay other third-party debts with no such statutory rights. In

the committee's view, the picking and choosing of which third-party debts to pay and which to convert was intentional. Based upon these findings, the committee determined respondent violated Rule 1.15(d). The committee also determined that respondent initially acted negligently, but then his actions became knowing and, in some instances, intentional.

Respondent indicated he took a more active role in managing his office after discovering the extensive, unpaid third-party debt in 2015. However, he admitted he continued to allow non-lawyers to write checks and transfer money from the trust account. In fact, the trust account records respondent provided for January 2017 through December 2018 revealed that, of the approximately 963 checks issued from the trust account, respondent signed only one, his associate attorney signed approximately 70, his CPA signed 18, and his former paralegal (Jennifer King) signed approximately 875. Respondent's defense to this misconduct was "when you have that many clients, it's almost impossible to write that many checks and practice law." Based upon these findings, the committee determined respondent knowingly violated Rule 5.3.

Respondent's contingency fee contract included a provision allowing him to pass overhead costs to his clients, which he did by listing a $125 charge on settlement disbursement statements as "Office Expenses." Respondent acknowledged this occurred but stated, "I don't know how it slipped in. Maybe somebody started – a new person started at the office and started doing that." The committee determined that, despite having substantial experience in the practice of law and in the area of personal injury, respondent allowed a provision into his contract in violation of Rule 1.8(e)(3). The committee also determined that respondent did so knowingly.

Respondent told the ODC that his agreements with third-party providers were oral agreements and were not reduced to writing. However, testimony and evidence presented at the formal hearing indicated there were written agreements or

19

guarantees with at least Oasis and Magnolia. Furthermore, respondent's clients signed settlement disbursement statements upon disbursement of their settlement funds, which disbursement statements detail the amounts being withheld from the clients' settlements to pay third-party providers. The committee found the client's signature on the disbursement statement indicated their agreement to the deductions and disbursements. The committee also found, however, that respondent appeared to believe only the client was bound by the disbursement statement. Disagreeing with respondent, the committee determined the disbursement statements allowed clients to rely upon respondent to pay the bills listed on said disbursement statements. Therefore, according to the committee, respondent clearly misrepresented to certain clients that he would pay the bills when he, in fact, knew he intended to use the funds to pay the third-party debts of other clients. Respondent also knowingly made false statements to the ODC during both his sworn statement and his recorded interview. During the sworn statement, these false statements included (1) blaming Ms. Samuels for Dr. Van Wormer not being paid even though she was no longer employed by respondent at the time, (2) claiming he did not know why Dr. Van Wormer was not paid, (3) claiming he reconciled his trust account settlement disbursement statements, and (4) claiming he had never had a problem with failing to pay third-party providers before Dr. Van Wormer's disciplinary complaint. During the recorded interview when he advised the ODC of the $4.2 million conversion, respondent denied knowledge of the conversion and again blamed Ms. Samuels. He also (1) failed to advise the ODC that he did not have a trust account for approximately four years during the years of conversion, (2) failed to disclose that he processed all client settlements through his operating account even before Ms. Samuels began working for him and for four years during her employment, and (3) failed to disclose the numerous overdrafts of his operating account during that time period. The committee further found that respondent made

20

misleading statements during the formal hearing. A review of reports created by respondent's CPA demonstrated that respondent was still failing to pay several third-party providers (outside of the limited number of providers with whom he had made such an agreement) immediately upon settlement after 2015. Nevertheless, respondent falsely stated at the hearing that these providers were being paid immediately. Based upon these findings, the committee determined respondent intentionally violated Rules 8.1(a), 8.1(b), and 8.4(c). The committee also determined respondent violated Rule 8.4(a) through his violation of the other provisions of the Rules of Professional Conduct in Count I.

Count II: Respondent acknowledged that Mr. Montgomery's personal injury claim was settled without his permission or authority, which the committee determined violated Rule 1.2 of the Rules of Professional Conduct. Respondent also acknowledged that he did not explain to Mr. Montgomery the option of pursuing the driver individually for injuries and damages not covered by the insurance policy. In mitigation, respondent claimed that he settled Mr. Montgomery's claim for the policy limits and that he could tell the driver had no assets because of his age, location, type of vehicle, and type of policy. In settling the claim, respondent relied on the power of attorney provision in his contingency fee contract, which the committee determined violated Rule 1.8(k). In light of respondent's substantial experience in the practice of law, the committee determined respondent acted knowingly.

After making its factual findings and determinations regarding rule violations, the committee determined respondent violated duties owed to his clients, the public, and the legal system. As discussed above, the committee determined respondent acted negligently, knowingly, and intentionally at times. His conduct caused actual harm to two clients when their accounts were sent to collections by Oasis. His conduct also continues to cause harm because, as of the date of the formal hearing,

21

collected funds totaling $229,550.59 remain unpaid to third-party providers. Additionally, third-party providers suffered the loss of the time value of money during the period of non-payment. Finally, Dr. Van Wormer incurred the additional time, effort, and expense of trying to collect from respondent before filing his disciplinary complaint. Nevertheless, the committee noted respondent's extensive efforts to pay down the third-party debt. Relying on the ABA's *Standards for Imposing Lawyer Sanctions*, the committee determined the baseline sanction is disbarment.

The committee found the following aggravating factors are present: submission of false evidence, false statements, or other deceptive practices during the disciplinary process, substantial experience in the practice of law (admitted 1997), failure to properly train and supervise his office staff, failure to seek appropriate counsel upon learning of the several million dollars in unpaid third-party debt, the amount and duration of the conversion, and the significant number of clients and third-party providers impacted by the conversion. In mitigation, the committee noted the absence of a prior disciplinary record, efforts to make restitution or rectify the consequences of the misconduct, and character or reputation.

After further considering the court's prior jurisprudence addressing similar misconduct, the committee recommended respondent be disbarred. The committee further recommended that respondent make restitution on the balance of the unpaid third-party debt.

Both respondent and the ODC objected to the hearing committee's report.

*Disciplinary Board Recommendation*

After review, the disciplinary board adopted the hearing committee's factual findings with one exception. While the committee found respondent failed to

maintain a trust account from 2006 to January 2011, the board determined that respondent's testimony and other evidence presented at the hearing established he failed to maintain a trust account from 2006 to November 2012. Respondent's trust account registration records indicate he added a new trust account on November 14, 2012, and he could provide no documentary evidence to show he maintained a trust account in 2011.

Based on these facts, the board agreed with the committee's findings regarding rule violations with one exception. While the committee determined respondent violated Rule 1.15(d) of the Rules of Professional Conduct in part because it determined the settlement disbursement statements constitute a directive by the clients under Rule 1.15(d) for respondent to deliver to third parties the funds set forth in the disbursement statement, the board found that the disbursement statements do not fall under the purview of Rule 1.15(d). Accordingly, the board declined to find this rule violation as it relates to the disbursement statements.

The board then determined respondent violated duties owed to his clients, the public, the legal system, and the legal profession. The board agreed with the committee that, at times, respondent acted negligently, knowingly, and intentionally. The board also agreed with the committee regarding the harm caused by respondent's misconduct. Additionally, the board determined respondent caused potential harm to his clients who still owe debts to third-party providers and to the third-party providers who are still owed money. Mr. Montgomery also suffered actual and potential harm, and respondent's conduct caused harm to the reputation of the legal profession. The board agreed that disbarment is the baseline sanction.

In aggravation, the board found a pattern of misconduct, multiple offenses, submission of false evidence, false statements, or other deceptive practices during the disciplinary process, and substantial experience in the practice of law. In mitigation, the board found the absence of a prior disciplinary record, timely good

faith effort to make restitution or to rectify the consequences of the misconduct, and character or reputation.

Turning to the issue of an appropriate sanction, the board determined that Guideline 1 (repeated or multiple instances of intentional conversion of client funds with substantial harm) of the permanent disbarment guidelines set forth in Supreme Court Rule XIX, Appendix D, is applicable here. According to the board, the court's prior jurisprudence addressing similar misconduct also supports permanent disbarment as the appropriate sanction in this matter. Nevertheless, the board also considered the court's mandate, set forth in Supreme Court Rule XIX, § 10(A)(1), that permanent disbarment shall only be imposed when (1) the lawyer's misconduct is so egregious as to demonstrate a convincing lack of ethical and moral fitness to practice law, and (2) there is no reasonable expectation of significant rehabilitation in the lawyer's character in the future. Regarding the first factor, the board determined respondent's efforts to remedy the initial $4.2 million conversion, which was negligent, amounted to additional violations of the Rules of Professional Conduct that were intentional and egregious. With respect to the second factor, the board noted that respondent intentionally lied to the ODC during its investigation and made "less than forthright statements" during the formal hearing, both of which demonstrate there is no reasonable expectation of significant rehabilitation in his character in the future.

Under these circumstances, the board recommended respondent be permanently disbarred. The board further recommended respondent make restitution to the third-party providers to whom money is still owed.[4]

_____

[4] Respondent's exhibits indicate these third-party providers include Magnolia ($44,850), Metropolitan ($70,930.09), and Oasis ($113,770.50).

24

Respondent filed an objection to the board's recommendation.  Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

**DISCUSSION**

Bar disciplinary matters fall within the original jurisdiction of this court.  La. Const. art. V, § 5(B).  Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. *In re: Banks*, 09-1212 (La. 10/2/09), 18 So. 3d 57.  While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. *See In re: Caulfield*, 96-1401 (La. 11/25/96), 683 So. 2d 714; *In re: Pardue*, 93-2865 (La. 3/11/94), 633 So. 2d 150.

The record establishes by clear and convincing evidence that respondent failed to properly supervise his non-lawyer staff, resulting in the conversion of approximately $4.2 million belonging to third parties, intentionally continued to convert third-party funds totaling approximately $1.8 million in order to pay older third-party debts, failed to maintain a trust account for several years, lied on his trust account disclosure statements that he did not handle client funds, allowed non-lawyers to sign trust account checks, charged clients for inappropriate office expenses, settled a client's personal injury claim without the client's knowledge or consent, and lied to the ODC during its investigation.  This conduct amounts to a violation of the Rules of Professional Conduct as found by the hearing committee and modified by the disciplinary board.

Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent's actions.  In determining

a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. *Louisiana State Bar Ass'n v. Reis*, 513 So. 2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. *Louisiana State Bar Ass'n v. Whittington*, 459 So. 2d 520 (La. 1984).

The record further establishes that respondent acted negligently, knowingly, and intentionally in violating duties owed to his clients, the public, the legal system, and the legal profession. His conduct caused actual and potential harm to his clients, third-party providers, and the legal profession. We agreed with the committee and the board that disbarment is the baseline sanction.

Aggravating factors include a pattern of misconduct, multiple offenses, submission of false evidence, false statements, or other deceptive practices during the disciplinary process, and substantial experience in the practice of law. Mitigating factors include the absence of a prior disciplinary record, timely good faith effort to make restitution or to rectify the consequences of the misconduct, character or reputation, and remorse.

Considering the mitigating factors present, in particular the significant restitution respondent has already made and continues to make, we find a downward deviation from the baseline sanction is appropriate. Accordingly, we will impose a three-year suspension from the practice of law. We will further order respondent to make full restitution to the third-party providers to whom money is still owed.

**DECREE**

Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it

26

is ordered that Tim L. Fields, also known as Timmy L. Fields, Louisiana Bar Roll number 24794, be and he hereby suspended from the practice of law for three years. It is further ordered that respondent shall make full restitution to the third-party providers to whom money is still owed. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.

# SUPREME COURT OF LOUISIANA

## NO. 2023-B-0343

## IN RE: TIM L. FIELDS

*ATTORNEY DISCIPLINARY PROCEEDING*

**WEIMER, C.J.**, concurring in part and dissenting in part.

I concur in the majority's conclusion that discipline is warranted in this matter, but respectfully dissent from the discipline imposed, believing that disbarment is not only appropriate but required based on respondent's prolonged and egregious course of misconduct.

The majority documents extensively and in great detail the misconduct proved by clear and convincing evidence that (the majority agrees) warrants the baseline sanction of disbarment: "respondent failed to properly supervise his non-lawyer staff, resulting in the conversion of approximately $4.2 million belonging to third parties, intentionally continued to convert third-party funds totaling approximately $1.8 million in order to pay older third-party debts, failed to maintain a trust account for several [6] years, lied on his trust account disclosure statements that he did not handle client funds, allowed non-lawyers to sign trust account checks, charged clients for inappropriate office expenses, settled a client's personal injury claim without the client's knowledge or consent, and lied to the ODC during its investigation." **In re: Tim L. Fields**, 23-0343 (La. 11/ __/23), slip op. at 25. While respondent acknowledged that he "wasn't exactly candid" during the ODC's investigation, in fact, he lied during a sworn statement and continued his deception by claiming that a "woman" at the LSBA whose name who he could not remember and whose identity he made no attempt to verify contacted him and advised that he did not need a trust account because he only

handled personal injury matters. *Id.*, slip op. at 12-13. This claim is unbelievable and, quite frankly, preposterous.

In describing the conversion of funds in which respondent engaged as a "rolling conversion," akin to "robbing Peter to pay Paul," the sheer breadth and volume of respondent's transgressions is understated. Between 2009 and 2019 (a 10-year period), respondent converted a total of approximately $6 million. *Id.*, slip op. at 10. Respondent's behavior is more akin to robbing Peter and Paul to pay John, James, Matthew and Luke.

The majority acknowledges all of these facts and yet finds a downward deviation from the baseline sanction of disbarment is appropriate, citing respondent's lack of a prior disciplinary record, remorse, and "good faith" efforts at restitution. Respectfully, I disagree.

As to the absence of a prior disciplinary record, I note that respondent's conduct extended over a period of ten years and was comprised of multiple deeds warranting disciplinary action. The sheer length and breath of respondent's misconduct, and the fact that respondent was able to avoid the day of disciplinary reckoning for such a long period of time, in my view, mitigates against respondent receiving any credit for lack of a prior disciplinary record. As to respondent's remorse and efforts at restitution, both are admirable, but cannot erase or mitigate the fact that efforts at restitution only occurred after respondent was called out for his misconduct. And, even those efforts involved a Ponzi-like scheme of "rolling conversions." The majority's imposition of a three-year period of suspension, based largely on respondent's "significant" restitution, serves only to empower individuals to misappropriate funds and then, if caught, pay them back. Such a result is counterintuitive to our responsibility to "maintain high standards of

2

conduct, protect the public, preserve the integrity of the profession, and deter future misconduct." *Id.*, slip op. at 26.

Given the depth, breadth, and volume of respondent's misconduct, as outlined above, and the lack of any excuse therefor, disbarment is the minimum sanction I would consider in this matter.

# SUPREME COURT OF LOUISIANA

## No. 2023-B-00343

## IN RE: TIM L. FIELDS

## ATTORNEY DISCIPLINARY PROCEEDING

**Crichton, J., concurs in part, dissents in part, and assigns reasons.**

I agree with the majority's finding that respondent has violated the multitude of Rules of Professional Conduct as alleged. However, I disagree with the significant downward deviation made by the majority to impose the sanction of three years suspension, as I find it unduly lenient. The majority determined that the mitigating factors, notably restitution made by respondent, support the downward deviation. In my view, the restitution that respondent made does indeed support such a deviation, but only from the permanent disbarment recommended by the Disciplinary Board to regular disbarment. *See In re: Perricone*, 18-1233 (La. 12/5/18), 263 So. 3d 309 (Crichton, J., additionally concurring and explaining the difference between permanent disbarment and regular disbarment). *See also*, *e.g.*, *In re: Pullins-Gorham*, 20-0692 (La. 12/11/20), 315 So. 3d 187 (Crichton, J., concurring in part and dissenting in part, noting respondent's "timely good faith efforts to make restitution"); *In Re: Connie P. Trieu*, 19-1680 (La. 3/9/20), 290 So. 3d 658 (Crichton, J., concurring in part and dissenting in part, noting the majority failed to consider the numerous mitigating factors and would therefore impose a lesser sanction).

As thoroughly set forth by the majority, respondent has engaged in egregious rule violations that, in my view, demonstrate a deliberate disregard for our noble profession and a lack of moral fitness to practice law. In addition to the specific and intentional conversion of millions of dollars belonging to third parties, respondent

1

has engaged in flagrant dishonesty in the face of these violations. I therefore would impose the sanction of disbarment.